UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------X

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED:  3/31/2016

DAVID NASSRY,                                       :
                                                    :
                                                    :
                          Plaintiff,                :          1:13-cv-4719-GHW
                                                    :
            -v -                                     :          MEMORANDUM OPINION
                                                    :              AND ORDER
ST. LUKE'S ROOSEVELT HOSPITAL,                      :
VICTORIA SHARP, and KARL HOFFMAN,                   :
                                                    :
                          Defendants.               :
                                                    :
------------------------------------------------------------------ X

GREGORY H. WOODS, District Judge:

## I.    INTRODUCTION

Dr. David Nassry briefly worked part-time as a dentist at a clinic operated by St. Luke's

Roosevelt Hospital Center ("St. Luke's").  Four months after he was hired, St. Luke's terminated Dr.

Nassry's employment because of documented errors in his patients' dental notes.  Dr. Nassry

contends that the errors were not serious enough to warrant termination, and that he was really

terminated because he is Muslim and a native of Afghanistan.  Dr. Nassry also suffers from a

chronic kidney condition, and claims that he was denied a reasonable accommodation prior to his

termination, and that he was terminated in retaliation for requesting such an accommodation.

Because Dr. Nassry fails to present sufficient evidence that his employer's reasons for the

termination were pretext for discrimination or retaliation, and he fails to present evidence that his

employer refused any requested accommodation, Defendants' motion for summary judgment is

GRANTED.

## II.     BACKGROUND[1]

Dr. Nassry is a dentist with advanced training in infectious diseases, and works primarily with dental patients diagnosed with HIV/AIDS.  Statement of Undisputed Facts ("SUF") ¶ 41, Dkt. No. 69-1.  He is also Muslim and a native of Afghanistan, and suffers from chronic kidney disease. Second Amended Complaint ("Compl.") ¶¶ 8, 15, Dkt. No. 10-1; Nassry Dep. at 190:14–17, Dkt. Nos. 60-10, 60-11.  In 2012, Dr. Nassry worked part-time as a dentist for the Center for Comprehensive Care (the "CCC"), a nonprofit medical center operated by St. Luke's, which provides medical care to HIV patients and their family members.  SUF ¶¶ 1, 7; Compl. ¶¶ 1–2.  In that capacity, Dr. Nassry provided primary oral care for HIV-positive patients and their families. SUF ¶ 9.  Dr. Nassry worked three days per week at the CCC—Wednesdays, Thursdays, and Fridays—from 8:30 a.m. to 5:00 p.m. each day.  *Id.* ¶ 45.

Dr. Nassry's employment began on April 2, 2012, when he was hired by Dr. Karl Hoffman, the CCC's Director of Dentistry.  *Id.* ¶¶ 5, 7; Nassry Dep. at 47:20–48:8.  Dr. Hoffman served as Dr. Nassry's immediate supervisor throughout Dr. Nassry's employment—although Dr. Hoffman only spent Thursday mornings at the same clinic location as Dr. Nassry—and he was aware of Dr. Nassry's chronic kidney condition at the time that he hired him.  *Id.* ¶¶ 24, 66; Nassry Dep. at 57:10–12.

During his time at the CCC, Dr. Nassry's medical condition forced him to be absent from work on several occasions.  SUF ¶ 25; *see also* Dr. Nassry and Dr. Hoffman Emails ("Emails") dated June 4, 2012–August 7, 2012 at D000955–988, Ex. Q of Dkt. No. 60-12.  Dr. Nassry was never denied any disability-related leave or discouraged from taking disability-related leave.  SUF ¶ 25; Nassry Dep. at 206:16–207:4.  Rather, in response to Dr. Nassry's emails indicating that he would be

---

[1] Unless otherwise specified, facts are taken from the parties' Local Rule 56.1 Statements of Undisputed Facts, Dkt. Nos. 60, 69-1, 72, and the evidence submitted in connection with this motion.

absent or was suffering from health complications, Dr. Hoffman responded with messages such as: "Let me know how everything goes with your health. Health is first!!!!!!!!!"; "It is very important that you get better and I encourage you not to come to work if you don't feel well;" and "feel free to take as much time as you need in order to get well." SUF ¶ 26; Emails dated July 17, 2012 at D000976. In response, Dr. Nassry wrote: "Many thanks for your kind words of encouragement;" and "I miss you in the clinic. And no, I'm not just saying that. Can't wait for your return." SUF ¶ 26; *see also* Dr. Nassry Dep. at 87:11–14 ("As he asked how I was doing when things weren't going so well, he would say, you know, 'Hope you get better. Health is primary. Don't worry.'").

Dr. Nassry's relationship with Dr. Hoffman deteriorated just a few months into his employment. Dr. Nassry had a meeting with Dr. Hoffman on July 5, 2012, during which Dr. Hoffman raised deficiencies in Dr. Nassry's performance, although the parties dispute what exactly was discussed during that meeting. Dr. Hoffman recalls that he identified a number of errors and omissions in the dental notes for Dr. Nassry's patients at the meeting. SUF ¶ 15. A patient's dental records at the CCC are maintained electronically in the same system as a patient's medical records. *Id.* ¶ 10. Dr. Hoffman believed that the dental notes contained omissions and inaccurate information, were poorly organized, and used the wrong template. *Id.* ¶ 15; *see also* Dr. Hoffman's Evaluation of Dr. Nassry ("Nassry Evaluation") at D000969, Ex. K of Dkt. No. 60-12. Dr. Hoffman characterized "mostly all" of Dr. Nassry's dental notes as having "egregious" errors, although he did not believe that termination at that time was warranted because he thought that Dr. Nassry could still improve his performance. SUF ¶ 80; Hoffman Dep. at 138:14–16; 139:23–140:8, Dkt. Nos. 60-3, 60-4.

Dr. Hoffman also discussed productivity-related issues with Dr. Nassry, both prior to, and at, the July 5, 2012 meeting. SUF ¶¶ 47–48, 59; Nassry Evaluation D000968–969. For each clinic session, Dr. Nassry was expected "to see 10 patients a session and to do at least 2 procedures in the

majority of them." Emails dated June 26, 2012 D000962. In order to reach the ten-patient-per-session goal, and to account for the fact that approximately 50% of patients often failed to show up for scheduled appointments, Dr. Nassry was encouraged to double book patients. SUF ¶ 75; Emails dated June 26, 2012 D000962; Nassry Evaluation at D000970; Hoffman Dep. at 38:13–17. Dr. Nassry was also advised that he was generally expected to perform two procedures per patient because the practice increased productivity, and "minimize[d] the number of visits needed by the patient to finish the dental treatment plan and to reach optimum oral health." Nassry Evaluation at D000970.

Dr. Hoffman's written evaluation of Dr. Nassry—which was based on his notes from the July 5, 2012 meeting, and was emailed to Dr. Hoffman's supervisor the following week—indicate that Dr. Nassry's expected productivity levels were "below the expected." SUF ¶ 79; Nassry Evaluation at D000969. For example, Dr. Nassry had ten "working days" for the month of June 2012, and given the expectation that he see ten patients per session, he was "budget[ed]" 100 patients for those ten days. Nassry Evaluation at D000969. However, Dr. Nassry saw only 63 patients during that month, rather than the 100 patients expected, and thus Dr. Hoffman calculated that he had a productivity rating of only 63% for the month. *Id.* Health care providers at the CCC were expected to maintain productivity levels at or above 90%. SUF ¶ 75. Dr. Nassry's productivity level was 76% for April and 64% for May 2012, using the same metrics. Nassry Evaluation at D000969. In addition, Dr. Hoffman's evaluation noted that Dr. Nassry's "average [number] of dental procedure[s] per patient is one," rather than the expected two procedures per patient. *Id.*

Dr. Hoffman's evaluation provided three sets of "Expectations/Goals" going forward for Dr. Nassry. Nassry Evaluation at D000971. Those expectations included: (1) dental notes that were "accurate and written in the corresponding dental note template," with medical information "obtained verbally from the patient and/or from the patient's medical notes;" (2) "an increase in the

4

number of patients per session," which was to be accomplished by encouraging Dr. Nassry to "double book" patients; and (3) Dr. Nassry to arrive on time for scheduled meetings.  Nassry Evaluation at D000971.  Dr. Hoffman also imposed a six-month probationary period on Dr. Nassry's employment at the July 5, 2012 meeting, effective through December 2012.[2]  SUF ¶ 16. Finally, Dr. Hoffman also scheduled a meeting to follow up with Dr. Nassry for August 9, 2012.  *Id.*; Evaluation at D000971.

Dr. Nassry disputes that any deficiencies in his dental notes were discussed at the meeting. SUF ¶ 15; Nassry Dep. at 90:3–6.  Instead, he recalls that the discussion was focused on his purportedly deficient productivity levels and the effect that his medical absences were having on his productivity.  Nassry Dep. at 82:10–16; *id.* at 89:10–18 (stating that Dr. Hoffman explained that the productivity goal was "two procedures per patient, given a full schedule, so whatever that added up to").  During that discussion, Dr. Nassry recalls that Dr. Hoffman warned him that "things need to get better by December or else that's the end of your employment."  *Id.* at 90:23–91:3.  Dr. Nassry asserts that he understood Dr. Hoffman to mean that his chronic health condition had to improve by December 2012, or his employment would be terminated.  *Id.* at 91:4–24 ("He said my health. . . . I need to be better.").

Shortly after the meeting with Dr. Hoffman, Dr. Nassry complained to office managers and the Human Resources Office that Dr. Hoffman violated his rights under the ADA by requiring that he recover from his disability within the following six months, or face termination.  SUF ¶ 55.  On July 26, 2012, Dr. Nassry also indicated that he intended to file a complaint with the EEOC.  *Id.*

---

[2] Defendants contend that as a new employee, Dr. Nassry was already on a probationary status.  Accordingly, Defendants maintain that Dr. Hoffman extended Dr. Nassry's existing probationary status at the July 5, 2012 meeting, rather than place him on probationary status.  *See* SUF ¶ 16.  Whether Dr. Nassry was already on probationary status is immaterial to the outcome of the motion.

¶ 69.  Dr. Hoffman was made aware of Dr. Nassry's complaints shortly after each occurrence.  *Id.*
¶¶ 55, 69; Hoffman Dep. at 164:13–165:5.

In late July 2012, Dr. Hoffman reviewed Dr. Nassry's dental notes for his patients taken
after July 5, 2012.  SUF ¶ 17.  Dr. Hoffman found that the notes were "still very deficient," and
"actually getting worse."  Hoffman Dep. at 173:23–174:12.  Among other deficiencies, Dr. Hoffman
found that Dr. Nassry was incorrectly "copying and pasting [information] from one chart to
another," such that it appeared as though Dr. Nassry was performing medical treatments on dental
patients.  *Id.* at 197:22–24; 199:16–200:10 ("[W]hen you read this chart you actually think Dr. Nassry
did a physical examination. . . .  Dentists, they don't listen to the lungs.  Dentists, they don't listen to
the heart.  That's not pertinent to the chart.").  Thus, for example, dental notes appeared to indicate
that Dr. Nassry treated dental patients for a wide-range of medical symptoms, including erectile
dysfunction, carpel tunnel syndrome, and mononucleosis.  SUF ¶ 18(a); *see id.* ¶¶ 18(b–n).

On July 30, 2012, following his review of Dr. Nassry's dental notes, Dr. Hoffman
recommended that Dr. Nassry be terminated for failing to properly document dental procedures and
failing to follow dental protocols.  Recommendation of Termination, Ex. O of Dkt. No. 60-12.  Dr.
Hoffman sent the recommendation to Dr. Victoria Sharp, the Director of the CCC, to whom Dr.
Hoffman reported.  *Id.*; SUF ¶¶ 4, 6.  Dr. Sharp was responsible for terminating personnel, and she
agreed with Dr. Hoffman's recommendation.  SUF ¶¶ 4, 21.  On August 15, 2012, Dr. Sharp met
with Dr. Nassry and terminated his employment based on his charting and documentation
deficiencies.  *Id.* ¶ 21; Compl. ¶ 34.

Prior to being terminated, Dr. Nassry alleges that he made a request for an accommodation
of his chronic kidney condition.  This was what he characterizes as his request:  At some unspecified
point in time, Dr. Nassry spoke to an office manager, Rachel Leyba, regarding a ceiling fan that was
blowing cold air into the office.  Nassry Dep. at 196:2–6; 198:22–24.  Specifically, Dr. Nassry told

her that "the air is really blowing hard," and complained that the air was cold. *Id.* at 199:3–7; 200:4–7. Dr. Nassry contends that he raised the topic because he was concerned that the clinic did not have "negative air pressure"—where air is being sucked out of the room to help prevent the spread of airborne disease, rather than being blown into the room. *Id.* at 195:18–196:11; 197:15–21. Dr. Nassry does not allege that he explained to Ms. Leyba that the complaint of cold air related to his chronic kidney condition, or that he mentioned negative air pressure at all. *Id.* at 198:25–200:23. Ms. Leyba's response was that "[i]f you work harder, you won't feel the cold air." *Id.* at 200:4–7. She also explained that because she was menopausal, she liked the cold air. *Id.* at 200:17–19. Aside from that conversation with Ms. Leyba, Dr. Nassry only raised the topic of the cold air on one other occasion, in a "general conversation" with an unspecified gynecologist at the CCC. *Id.* at 200:20–201:9.

Also prior to his termination, Dr. Nassry alleges that he was subjected to discriminatory comments based on his ethnicity, national origin, and religion. Specifically, Dr. Nassry recounts that on approximately three or four occasions, Dr. Hoffman brought up "the fact that I live a block from the World Trade Center site," and questioned "how could someone like me live there with that beard and my race and my ethnicity, given what occurred on 9/11." *Id.* at 210:9–14; 219:17–25.[3] All three or four of the comments occurred prior to July 5, 2012. *Id.* at 212:14–15. Dr. Nassry also alleges that Dr. Anthony Richards, another dentist who rotated through the same clinic, referred to him as "the Muslim" on one occasion, and made racially disparaging comments directed at Patrice Hogue, an assistant at the CCC who was of Latin-American descent.[4] *Id.* at 146:17–25; 148:20–23; 222:6–223:2.

---

[3] In his opposition, Plaintiff argues that he was "indiscriminately called a terrorist" by Dr. Hoffman. Pl's. Opp'n at 26. Plaintiff fails to provide any citation to the record in support of the allegation, and after a thorough review, the Court is unable to find any factual support for the assertion.

[4] It is not clear how frequently Dr. Nassry saw Dr. Richards, but the record suggests that their interactions were limited. Plaintiff's Statement of Undisputed Facts states that "Dr. Nassry was the *only* dentist at the

Following his termination, Dr. Nassry filed an Intake Questionnaire with the Equal Employment Opportunity Commission ("EEOC").  Intake Questionnaire at D001104–D001107, Ex. U of Dkt. No. 60-13.  The EEOC dismissed the charge on April 10, 2013, and notified Dr. Nassry of his right to file suit within ninety days of receiving the notice.  EEOC Dismissal at D001102, Ex. U of Dkt. No. 60-13.  Dr. Nassry timely filed suit on July 9, 2013, and thereafter twice amended his complaint.  Dkt. Nos. 1, 2, 10-1.  The second amended complaint, filed on December 19, 2013, brings three federal causes of action against St. Luke's:  (1) discrimination on the basis of Dr. Nassry's ethnicity, national origin, and religion, under Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e, *et seq.*; (2) failure to accommodate Dr. Nassry's disability under Title I of the ADA, 42 U.S.C. §§ 12111, *et seq.*; and (3) retaliation for Dr. Nassry seeking reasonable accommodations under Title V of the ADA, 42 U.S.C. § 12203.  The complaint also alleges state law claims against all defendants for discrimination and retaliation under the New York State Human Rights Law (the "NYSHRL"), N.Y. Exec. Law §§ 290, *et seq.*; and the New York City Human Rights Law (the "NYCHRL"), N.Y. City Admin. Code §§ 8–101, *et seq.*

Following the completion of all discovery, Defendants filed a motion for summary judgment, seeking judgment in their favor with respect to all of Plaintiff's claims.  *See* Dkt. No. 59.

## III.   ANALYSIS

### A.  *Summary Judgment Standard*

Defendants are entitled to summary judgment on a claim if they can "show[ ] that there is no genuine dispute as to any material fact and [it is] entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986) ("[S]ummary judgment is proper 'if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the

---

West 17 Clinic[,] except on Thursday mornings when Dr. Hoffman saw patients at that location."  SUF ¶ 66 (emphasis added).

affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.'" (quoting former Fed. R. Civ. P. 56(c))).  A genuine dispute exists where "the evidence is such that a reasonable jury could return a verdict for the nonmoving party," while a fact is material if it "might affect the outcome of the suit under governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  "Factual disputes that are irrelevant or unnecessary will not be counted." *Id.*

To defeat a motion for summary judgment, Plaintiff "must come forward with 'specific facts showing that there is a genuine issue for trial.'" *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (quoting former Fed. R. Civ. P. 56(e)).  "[M]ere speculation or conjecture as to the true nature of the facts" will not suffice. *Hicks v. Baines*, 593 F.3d 159, 166 (2d Cir. 2010) (internal quotation marks and citations omitted).  Plaintiff "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita,* 475 U.S. at 586.

In determining whether there exists a genuine dispute as to a material fact, the Court is "required to resolve all ambiguities and draw all permissible factual inferences in favor of the party against whom summary judgment is sought." *Johnson v. Killian*, 680 F.3d 234, 236 (2d Cir. 2012) (internal quotation marks and citation omitted).  The Court's job is not to "weigh the evidence or resolve issues of fact." *Lucente v. Int'l Bus. Machines Corp.*, 310 F.3d 243, 254 (2d Cir. 2002).  Rather, the Court must decide whether a rational juror could find in favor of Plaintiff.  *Id.*

Although the Second Circuit has noted that "an extra measure of caution" may be required in discrimination cases "because direct evidence of discriminatory intent is rare and such intent often must be inferred from circumstantial evidence," the Circuit has made it clear that "summary judgment remains available for the dismissal of discrimination claims in cases lacking genuine issues of material fact." *Holtz v. Rockefeller & Co., Inc.*, 258 F.3d 62, 69 (2d Cir. 2001); *see also Meiri v. Dacon*, 759 F.2d 989, 998 (2d Cir. 1985) ("[T]he salutary purposes of summary judgment—avoiding

protracted, expensive and harassing trials—apply no less to discrimination cases than to commercial or other areas of litigation.")

### B. *Title VII Discrimination Claims*

Defendants first argue that the Court should grant summary judgment in their favor, with respect to Plaintiff's claims under Title VII and the NYSHRL that he was subjected to a hostile work environment and discharged on the basis of his ethnicity, national origin, and religion.[5] Because the same substantive standards apply to Plaintiff's claims under Title VII and the NYSHRL, the Court analyzes these claims together. *See Tolbert v. Smith*, 790 F.3d 427, 439 (2d Cir. 2015) ("Hostile work environment claims under Title VII and the NYSHRL are governed by the same standard."); *Thomson v. Odyssey House*, No. 14-cv-3857 (MKB), 2015 WL 5561209, at *14 (E.D.N.Y. Sept. 21, 2015) ("As with hostile work environment claims, claims of discrimination under the NYSHRL are analyzed under the same standard as a Title VII claim.").

The Court observes that Plaintiff has arguably abandoned his claims under Title VII and the NYSHRL—in opposition to Defendants' motion for summary judgment, he argues that his claims should survive under the more liberal standards of the NYCHRL without directly addressing the more stringent standards under Title VII and the NYSHRL. *See Jackson v. Fed. Exp.*, 766 F.3d 189, 195 (2d Cir. 2014) ("[A] partial response arguing that summary judgment should be denied as to some claims while not mentioning others may be deemed an abandonment of the unmentioned claims."). Nevertheless, because "the papers and circumstances viewed as a whole" do not necessarily warrant the inference that Plaintiff intended to abandon those claims, *see id.* at 196, the Court addresses Defendants' motion for summary judgment without deeming the claims abandoned.

---

[5] For purposes of Title VII, "discrimination based on ethnicity . . . constitutes racial discrimination." *Vill. of Freeport v. Barrella*, ---F.3d---, 2016 WL 611877, at *5 (2d Cir. Feb. 16, 2016).

### 1. *Discrimination*

#### a. The *McDonnell Douglas* Burden-Shifting Test

Title VII makes it an "unlawful employment practice for an employer . . . to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin[.]"  42 U.S.C. § 2000e-2.  Courts analyze Title VII discrimination claims under a burden-shifting framework first outlined by the Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).  Under that framework:

> [P]laintiff first must establish a *prima facie* case of discrimination based on [a protected status].  If he does so, the burden shifts to the employer to articulate a legitimate, non-discriminatory reason for the employee's dismissal. If such a reason is proffered, the burden shifts back to the plaintiff to prove that discrimination was the real reason for the employment action.

*Graham v. Long Island R.R.*, 230 F.3d 34, 38 (2d Cir. 2000) (internal citations omitted).

To make out a prima facie case of discrimination, Plaintiff must show that:  "(1) he belongs to a protected group; (2) he was qualified for his position; (3) his employer took an adverse action against him; and (4) the adverse action occurred in circumstances giving rise to an inference of . . . discrimination."  *Kirkland v. Cablevision Sys.*, 760 F.3d 223, 225 (2d Cir. 2014); *see also Graham*, 230 F.3d at 38 (describing that in the context of alleged discriminatory discharge, the second prong requires plaintiff to show that he was "performing his duties satisfactorily").  A plaintiff's burden at the prima facie stage is "minimal" and "requires no evidence of discrimination."  *James v. New York Racing Ass'n*, 233 F.3d 149, 153 (2d Cir. 2000).

"Under the *McDonnell Douglas* scheme, 'establishment of the *prima facie* case in effect creates a presumption that the employer unlawfully discriminated against the employee.'"  *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 506 (1993) (brackets omitted) (quoting *Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 254 (1981)).  The employer must then "'produc[e] evidence' that the adverse

employment action[ ] w[as] taken 'for a legitimate, nondiscriminatory reason.'" *Id.* at 507 (quoting *Burdine*, 450 U.S. at 254). But "although the *McDonnell Douglas* presumption shifts the burden of *production* to the defendant, 'the ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff.'" *Id.* (brackets omitted) (quoting *Burdine*, 450 U.S. at 253).

If the employer satisfies its burden of production and produces evidence of a legitimate, non-discriminatory reason for the employee's dismissal, "the presumption [of discrimination] completely 'drops out of the picture.'" *James*, 233 F.3d at 154 (quoting *St. Mary's*, 509 U.S. at 511). At that point, "the employer will be entitled to summary judgment . . . unless the plaintiff can point to evidence that reasonably supports a finding of prohibited discrimination." *Id.* The Second Circuit described the plaintiff's burden at this third stage of the *McDonnell Douglas* framework as follows:

> The plaintiff must produce not simply some evidence, but sufficient evidence to support a rational finding that the legitimate, non-discriminatory reasons proffered by the defendant were false, and that more likely than not discrimination was the real reason for the employment action. In short, the question becomes whether the evidence, taken as a whole, supports a sufficient rational inference of discrimination. To get to the jury, it is not enough to disbelieve the employer; the factfinder must also believe the plaintiff's explanation of intentional discrimination.

*Weinstock v. Columbia Univ.*, 224 F.3d 33, 42 (2d Cir. 2000), *superseded by statute on other grounds* (internal citations and alterations omitted).

### b. Application

The Court assumes without deciding that Plaintiff has made out a prima facie case under *McDonnell Douglas,* thus shifting the burden to Defendants to put forth a legitimate, nondiscriminatory reason for his termination.

Defendants have met their burden under the second stage of the *McDonnell Douglas* framework by proffering sufficient evidence that Plaintiff was terminated due to the errors and

omissions contained in the dental notes for his patients.  "Poor performance is a legitimate, non-discriminatory reason for terminating an employee." *Ramsaran v. Booz & Co. (N.A.) Inc.*, No. 14-cv-708 (GHW), 2015 WL 5008744, at *7 (S.D.N.Y. Aug. 24, 2015) (collecting cases).

Turning to the third stage of the *McDonnell Douglas* framework, Plaintiff fails to demonstrate sufficient evidence for a reasonable jury to infer that his race, religion, or national origin played a role in his termination.  Plaintiff's evidence of discrimination hinges on Dr. Hoffman's remarks regarding Plaintiff's proximity to the World Trade Center, made on three or four occasions, and Dr. Richards's remark referring to Plaintiff as "the Muslim."  Although "remarks made by decisionmakers that could be viewed as reflecting a discriminatory animus" may give rise to an inference of discrimination, *Chertkova v. Connecticut Gen. Life Ins. Co.*, 92 F.3d 81, 91 (2d Cir. 1996), "'stray remarks' alone do not support a discrimination suit," *Danzer v. Norden Sys., Inc.*, 151 F.3d 50, 56 (2d Cir. 1998).  In order to determine whether a remark is a probative statement that evidences an intent to discriminate or whether it is a non-probative "stray remark," courts consider:

> (1) who made the remark (i.e., a decision-maker, a supervisor, or a low-level co-worker); (2) when the remark was made in relation to the employment decision at issue; (3) the content of the remark (i.e., whether a reasonable juror could view the remark as discriminatory); and (4) the context in which the remark was made (i.e., whether it was related to the decision-making process).

*Henry v. Wyeth Pharm., Inc.*, 616 F.3d 134, 149 (2d Cir. 2010).  "None of these factors should be regarded as dispositive," *id.* at 150, and where "other indicia of discrimination are properly presented, the remarks can no longer be deemed 'stray,'" *Danzer*, 151 F.3d at 56.

The remarks at issue constitute stray remarks.  Dr. Richards was a fellow dentist merely rotating through the Plaintiff's clinic.  Although Dr. Hoffman was Plaintiff's supervisor and made the remarks several weeks before recommending Plaintiff for termination, he "was not the final or sole decision maker."  *See Nidzon v. Konica Minolta Bus. Sols., USA, Inc.*, 752 F. Supp. 2d 336, 351 (S.D.N.Y. 2010).  Rather, Dr. Sharp was responsible for ultimately terminating Plaintiff, and Plaintiff

has not presented any evidence suggesting that she was motivated by a discriminatory animus based on race, religion, or national origin.  Moreover, while a reasonable jury could construe the content of the remarks as offensive, the remarks were "oblique" and the context in which they were made was completely divorced from the decision-making process.  *See Tomassi v. Insignia Fin. Grp., Inc.*, 478 F.3d 111, 115 (2d Cir. 2007) (["T]he more remote and oblique the remarks are in relation to the employer's adverse action, the less they prove that the action was motivated by discrimination."), *abrogated on other grounds by Gross v. FBL Fin. Servs., Inc.*, 557 U.S. 167 (2009).  Nor has any evidence of "other indicia of discrimination" been presented suggesting that the remarks constituted anything other than stray remarks.  The Court concludes that the remarks, standing alone, are insufficient for a reasonable jury to conclude that Plaintiff's discharge was motivated by discrimination on the basis of his race, religion, or national origin.

Moreover, the fact that Dr. Hoffman made the decision to hire Plaintiff points in the opposite direction, suggesting that it was unlikely that he was motivated by discriminatory animus in recommending termination just a few months after hiring Plaintiff.  "[W]hen the person who made the decision to fire was the same person who made the decision to hire, it is difficult to impute to her an invidious motivation that would be inconsistent with the decision to hire.  This is especially so when the firing has occurred only a short time after the hiring." *Grady v. Affiliated Cent., Inc.*, 130 F.3d 553, 560 (2d Cir. 1997).  The "same actor inference" may be applicable "so long as one management-level employee played a substantial role in both the hiring and firing of the plaintiff." *Penn v. New York Methodist Hosp.*, No. 11-cv-9137 (NSR), 2013 WL 5477600, at *14 (S.D.N.Y. Sept. 30, 2013) (quoting *Dorcely v. Wyandanch Union Free Sch. Dist.*, 665 F. Supp. 2d 178, 198 (E.D.N.Y. 2009).  The inference is applicable in the Title VII context.  *Id.* (collecting cases).

Application of the same actor inference may be inappropriate where a plaintiff's actions change the way that an employer perceives him. *See Feingold v. New York*, 366 F.3d 138, 154–55 (2d

Cir. 2004).  However, Plaintiff has not presented any evidence—for example, if Plaintiff had

complained that he was being subjected to discrimination on the basis of his race, religion or

national origin—to suggest that circumstances had changed since his hiring, such that Dr. Hoffman

may have been motivated by a discriminatory animus four months later when recommending him

for termination.  *See id.* at 155 (application of same actor inference inappropriate because

"complaints of discrimination could be found to have altered the circumstances of [plaintiff's]

employment").  Thus, the Court finds that application of the same actor inference is appropriate in

this context—with respect to Plaintiff's claims of discrimination on the basis of his race, religion,

and national origin—and that therefore an inference can be drawn that Dr. Hoffman was not

motivated by such discrimination at the time that he recommended termination.

For the foregoing reasons, Plaintiff has failed to meet his burden and failed to present

sufficient evidence "that would permit a rational factfinder to infer that the discharge was actually

motivated, in whole or in part, by discrimination." *Grady*, 130 F.3d at 561.  Accordingly, Defendants'

motion for summary judgment is GRANTED with respect to Plaintiff's Title VII and NYSHRL

claims for discrimination on the basis of his ethnicity, national origin, or religion.

## 2.  Hostile Work Environment

Plaintiff contends that the comments made by Dr. Hoffman and Plaintiff's co-worker, Dr.

Richards, created a hostile work environment.  To establish a hostile work environment claim under

Title VII, "a plaintiff must show that 'the workplace is permeated with discriminatory intimidation,

ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's

employment and create an abusive working environment.'" *Littlejohn v. City of New York*, 795 F.3d

297, 320–21 (2d Cir. 2015) (quoting *Harris v. Forklift Sys., Inc.,* 510 U.S. 17, 21 (1993)).

As the Second Circuit further explained in *Littlejohn*:

> This standard has both objective and subjective components:  the conduct complained
> of must be severe or pervasive enough that a reasonable person would find it hostile

or abusive, and the victim must subjectively perceive the work environment to be abusive. The incidents complained of must be more than episodic; they must be sufficiently continuous and concerted in order to be deemed pervasive.  In determining whether a plaintiff suffered a hostile work environment, we must consider the totality of the circumstances, including the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance.

795 F.3d at 321 (internal quotation marks and citations omitted).

"[E]vidence of harassment directed at other co-workers can be relevant to an employee's own claim of hostile work environment discrimination," and "the crucial inquiry focuses on the nature of the workplace environment *as a whole . . . .*" *Leibovitz v. New York City Transit Auth.*, 252 F.3d 179, 190 (2d Cir. 2001) (internal quotation marks and citation omitted); *see also Dabney v. Christmas Tree Shops*, 958 F. Supp. 2d 439, 459 (S.D.N.Y. 2013) ("Evidence of harassment directed at other co-workers or occurring outside Plaintiff's presence can be relevant to a hostile work environment claim, but it must occur in the same work environment as Plaintiff and adversely affect the terms and conditions of her employment[.]") (internal citations omitted), *aff'd sub nom. Dabney v. Bed Bath & Beyond*, 588 F. App'x 15 (2d Cir. 2014).

Plaintiff fails to present sufficient evidence for a reasonable juror to conclude that the remarks by Dr. Hoffman and Dr. Richards were either sufficiently severe or pervasive to create a hostile work environment.  None of the comments were physically threatening, and, according to Plaintiff, Dr. Hoffman made his remarks on only three or four occasions.  Moreover, Plaintiff concedes that he and Dr. Hoffman shared the same office space only on Thursday mornings, and that the remarks ceased in early July 2012.  Similarly, Dr. Richards referred to Plaintiff as "the Muslim" on only one occasion, and he appears to have spent only very limited time at the same clinic as Plaintiff.

Although the comments identified by Plaintiff may have been capable of being construed as offensive or inappropriate, "Title VII does not set forth a general civility code for the American

workplace." *Redd v. New York Div. of Parole*, 678 F.3d 166, 176 (2d Cir. 2012) (internal quotation marks omitted) (quoting *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68 (2006)). Rather, as the Second Circuit has explained, "[f]or racist comments, slurs, and jokes to constitute a hostile work environment, there must be more than a few isolated incidents of racial enmity, meaning that instead of sporadic racial slurs, there must be a steady barrage of opprobrious racial comments." *Schwapp v. Town of Avon*, 118 F.3d 106, 110 (2d Cir. 1997) (brackets, internal quotation marks, and citations omitted).

Viewing the evidence in a light most favorable to the Plaintiff, the sporadic comments are neither a "steady barrage" nor sufficiently severe to constitute a hostile work environment. *See Brown v. Coach Stores, Inc.,* 163 F.3d 706, 713 (2d Cir. 1998) (plaintiff failed to state hostile work environment claim where supervisor made, on occasion, racist remarks, including one directed at plaintiff); *Sattar v. Johnson*, No. 12-cv-7828 (GWG), 2015 WL 5439064, at *15 (S.D.N.Y. Sept. 11, 2015) (asking plaintiff "[a]re those terrorists your cousins?" in reference to recent terrorist attacks and referring to plaintiff being a Muslim on another occasion insufficient to constitute hostile work environment); *St. Juste v. Metro Plus Health Plan*, 8 F. Supp. 3d 287, 332 (E.D.N.Y. 2014) (four incidents of derogatory comments regarding plaintiff's religious dress and time spent attending prayer insufficient to constitute hostile work environment).

Moreover, although Dr. Richards' comments directed at a co-worker "may be of limited probative value" and must be considered on a motion for summary judgment, *see Schwapp*, 118 F.3d at 112, Plaintiff fails to provide any evidence suggesting that the remarks directed at Ms. Hogue—or any remarks directed at him, for that matter—adversely affected the conditions of his own employment. *See Leibovitz*, 252 F.3d at 190 (plaintiff "failed to allege or prove that harassment of other women adversely affected the terms and conditions of her own employment"). Accordingly,

Defendants' motion for summary judgment with respect to Plaintiff's hostile work environment claims under Title VII and the NYSHRL is GRANTED.

### C. Failure to Accommodate

Defendants next contend that summary judgment in their favor is warranted with respect to Plaintiff's claim that St. Luke's failed to provide a reasonable accommodation under the ADA.  An employer violates the ADA by "not making reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability . . . ."  42 U.S.C. § 12112(b)(5)(A).  "A plaintiff suing under the ADA for disability discrimination bears the burden of establishing a prima facie case."  *Graves v. Finch Pruyn & Co.*, 457 F.3d 181, 183–84 (2d Cir. 2006).  Thus, "[i]n so-called reasonable-accommodation cases, . . . the plaintiff's burden 'requires a showing that (1) plaintiff is a person with a disability under the meaning of the ADA; (2) an employer covered by the statute had notice of his disability; (3) with reasonable accommodation, plaintiff could perform the essential functions of the job at issue; and (4) the employer has refused to make such accommodations.'"  *Id.* at 184 (quoting *Rodal v. Anesthesia Group of Onondaga, P.C.*, 369 F.3d 113, 118 (2d Cir. 2004).  Defendants concede the first two of these elements, and thus the Court turns to whether St. Luke's refused to make an accommodation—the element on which the parties' briefs focused most of their attention.[6]

In his opposition, Plaintiff argues almost exclusively that Defendants failed to accommodate his disability by requiring that he meet certain productivity levels, and that he forego taking further medical absences.  Plaintiff's complaint, however, fails to allege a claim on either basis.  Rather, Plaintiff's failure-to-accommodate claims were premised solely on:  (1) Defendants' failure to provide "a reasonable accommodation to reduce the chance of being infected while performing his

---

[6] Because the Court finds that Plaintiff fails to present sufficient evidence regarding his employer's refusal to make an accommodation, the Court need not decide whether Plaintiff has presented sufficient evidence that he could perform the essential functions of the job.

job of providing dental care to patients with HIV," based on his "need to have negative air pressure in the procedure rooms," Compl. ¶¶ 24, 40; and (2) Defendants' failure "to accommodate Plaintiff with his reasonable request to reschedule or relocate a meeting with his supervisors," *id.* ¶ 41. Nowhere does the complaint suggest that Defendants failed to reasonably accommodate Plaintiff's disability because they refused to permit lower productivity levels or required that he cease taking medical leave.

Courts in this district have refused to consider new allegations and claims raised for the first time in an opposition to a motion for summary judgment. *E.g., Scott v. City of New York Dep't of Correction*, 641 F. Supp. 2d 211, 229 (S.D.N.Y. 2009) (limiting consideration to "far narrower" retaliation claims alleged in complaint, rather than unpleaded retaliation claims raised in plaintiff's opposition to motion for summary judgment), *aff'd sub nom. Scott v. New York City Dep't of Correction*, 445 F. App'x 389 (2d Cir. 2011); *see also Enzo Biochem, Inc. v. Amersham PLC*, 981 F. Supp. 2d 217, 224 (S.D.N.Y. 2013) ("A plaintiff may not pivot from its stated claims to new ones at the summary judgment stage simply because it inserted a few vague catch-all phrases into its pleadings."); *Southwick Clothing LLC v. GFT (USA) Corp.*, No. 99-cv-10452 (GBD), 2004 WL 2914093, at *6 (S.D.N.Y. Dec. 15, 2004) ("A complaint cannot be amended merely by raising new facts and theories in plaintiffs' opposition papers, and hence such new allegations and claims should not be considered in resolving the motion."); *Bonnie & Co. Fashions v. Bankers Trust Co.*, 170 F.R.D. 111, 119 (S.D.N.Y. 1997) ("[I]t is inappropriate to raise new claims for the first time in submissions in opposition to summary judgment."); *Petrisch v. HSBC Bank USA, Inc.*, No. 07-cv-3303 (KAM) (JMA), 2013 WL 1316712, at *10 (E.D.N.Y. Mar. 28, 2013) ("A certification or affidavit opposing a summary judgment motion is not a vehicle for plaintiff to reshape the theory and underlying facts of her discrimination claims as originally pled in her Complaint.").

It is not clear that the complaint provided Defendants with sufficient notice of the overhauled accommodation claims asserted in Plaintiff's opposition, and Plaintiff has not sought leave to amend the complaint.  *See Greenidge v. Allstate Ins. Co.*, 446 F.3d 356, 361 (2d Cir. 2006) (explaining that "the central purpose of a complaint is to provide the defendant with notice of the claims asserted against it," and that "a district court does not abuse its discretion when it fails to grant leave to amend a complaint without being asked to do so").  In any event, because the Court finds that Plaintiff has failed to present sufficient evidence that his employer refused to make an accommodation, including with respect to the accommodation claims asserted in his opposition, the Court need not resolve the issue.

"[T]he ADA contemplates that employers will engage in an 'interactive process' with their employees and in that way work together to assess whether an employee's disability can be reasonably accommodated."  *Brady v. Wal-Mart Stores, Inc.*, 531 F.3d 127, 135 (2d Cir. 2008) (brackets and internal quotation marks omitted) (quoting *Jackan v. New York State Dep't of Labor*, 205 F.3d 562 (2d Cir. 2000)).  "Liability for failure to provide a reasonable accommodation ensues only when the employer is responsible for a breakdown in that process."  *Goonan v. Fed. Reserve Bank of New York*, 916 F. Supp. 2d 470, 480 (S.D.N.Y. 2013) (internal quotation marks and citation omitted).  An employer can be said have impeded the process when "the employer knows of the employee's disability; the employee requests accommodations or assistance; the employer does not in good faith assist the employee in seeking accommodations; and the employee could have been reasonably accommodated but for the employer's lack of good faith."  *Id.* at 480 (internal quotation marks and citation omitted).

In *Parker v. Columbia Pictures Industries*, the Second Circuit explained that an employee's request for an accommodation "triggers a responsibility on the employer's part to investigate that request and determine its feasibility."  204 F.3d 326, 338 (2d Cir. 2000).  "An employee's failure to

make a request is not fatal to a claim for a reasonable accommodation; however, such a failure traditionally counsels against the claim as '[g]enerally it is the responsibility of the individual with a disability to inform the employer that an accommodation is needed.'" *Seabrook v. New York City Health & Hosps. Corp.*, No. 13-cv-4164 (NRB), 2015 WL 273652, at *6 (S.D.N.Y. Jan. 20, 2015) (quoting *Brady*, 531 F.3d at 135); *see also Flemmings v. Howard Univ.*, 198 F.3d 857, 861 (D.C. Cir. 1999) ("An underlying assumption of any reasonable accommodation claim is that the plaintiff-employee has requested an accommodation which the defendant-employer has denied.").

Plaintiff fails to present sufficient evidence for a reasonable jury to conclude that his employer impeded the interactive process or failed to reasonably accommodate Plaintiff's disability. In short, Plaintiff has not presented any evidence that he requested *any* accommodation, let alone that his employer denied him such an accommodation.

First, Plaintiff claims that his employer refused to provide rooms with negative air pressure. But Plaintiff's request was an off-hand comment that, at best, voiced a complaint along the lines of what many employees in an office setting routinely complain of—that the office was too cold and drafty. *See* Nassry Dep. at 199:4–5 ("I said, 'This air is blowing really hard.'"); *id.* at 200:4–5 ("I had also said that it was cold"). Plaintiff has not presented any evidence that he mentioned negative air pressure, nor did his off-hand comment alert his employer that his complaint was even tangentially related "to [his] known physical or mental limitations." *See* 42 U.S.C. § 12112(b)(5)(A).

Even assuming that Plaintiff's disability required that he be provided a room with negative air pressure in order to decrease the risk of contracting airborne diseases while treating dental patients, there is simply no basis for a reasonable jury to conclude that Plaintiff requested such an accommodation, or that Plaintiff's complaint—that he felt cold—triggered a duty on the part of his employer to investigate the feasibility of such an accommodation. *See Seabrook*, 2015 WL 273652, at *6 (granting defendant's summary judgment motion where plaintiff failed to show that there were

21

unrequested accommodations that defendant "should nevertheless have known to have provided"); *Breslof-Hernandez v. Horn*, No. 05-cv-384 (JGK), 2007 WL 2789500, at *10 (S.D.N.Y. Sept. 25, 2007) ("The plaintiff's request appeared to be nothing more than a request to accommodate a personal preference. Without more definite notice from the plaintiff . . . [regarding] how the disability relates to the request for an accommodation, the defendant was unable to participate in the interactive process that the ADA envisions."); *Magnotti v. Crossroads Healthcare Mgmt., LLC*, No. 14-cv-6679 (ILG) (RML), 2015 WL 5173528, at *7 (E.D.N.Y. Sept. 3, 2015) (dismissing complaint that failed to allege "that plaintiff required a reasonable accommodation in order to perform his job, let alone asked defendants for such an accommodation").

Plaintiff's complaint also alleges that Defendants refused to reasonably accommodate his disability by failing to reschedule an unidentified meeting. However, Plaintiff's Local Rule 56.1 Statement fails to identify any facts regarding the allegation, and Plaintiff failed to address the argument in his opposition to Defendants' motion for summary judgment. "[A]rguments not made in opposition to a motion for summary judgment are deemed abandoned." *Plahutnik v. Daikin Am., Inc.*, 912 F. Supp. 2d 96, 104 (S.D.N.Y. 2012); *see also Gaston v. City of New York,* 851 F.Supp.2d 780, 796 (S.D.N.Y. 2012) (dismissing claims as abandoned where plaintiff "failed to respond or even mention these claims in his opposition brief to defendants' summary judgment motion").

Turning to the positions first asserted in Plaintiff's opposition, Plaintiff argues that Defendants failed to accommodate his need for disability-related absences, or that Dr. Hoffman withdrew any such accommodation at the July 5, 2012 meeting. In support of this claim, Plaintiff asserts that Dr. Hoffman told him at the July 5, 2012 meeting that "things need to get better by December," by which Plaintiff understood Dr. Hoffman referred to his health. Plaintiff concedes, however, that he was never denied any requests for disability-related leave—including several absences *after* the July 5, 2012 meeting. Indeed, Dr. Hoffman told him to "feel free to take as much

time as you need in order to get well" less than two weeks after that very meeting.  Emails dated July 17, 2012 at D000976.

Moreover, Plaintiff seemingly concedes that he neither requested nor required any leave, other than that already provided by his employer.  Plaintiff acknowledges that the disability-related absences "were already covered by a paid sick-leave policy," and that he "was not so much requesting an accommodation for leave; he was stating the reality that he was too sick to work and must be absent" pursuant to the paid sick-leave policy.  Pl.'s Opp'n at 12.  Plaintiff makes no argument that he required or requested additional leave, in excess of his paid sick-leave, as an accommodation in order to perform his job, or that his employer denied any such request.

Plaintiff also argues—again, for the first time in his opposition—that he was denied a reasonable accommodation because the clinic's method of calculating his productivity penalized him for taking disability-related absences.  He asserts that defendants were required to engage in an unsolicited interactive process to determine whether reduced productivity expectations would accommodate his need for disability-related absences.  But, fatally, Plaintiff fails to present any evidence supporting the underlying assumption that his disability-related absences adversely impacted his measured productivity.[7]

For example, Plaintiff cites Dr. Hoffman's evaluation of him as evidence that Dr. Hoffman considered the absences when measuring his productivity.  *See* Nassry Evaluation D000969.  But rather than providing support, Dr. Hoffman's evaluation strongly undermines Plaintiff's assertion.  For example, in June 2012, Dr. Hoffman budgeted 100 expected patients for Plaintiff, based on ten working days and the expectation that Plaintiff see ten patients per session.  Because Plaintiff only saw 63 patients during those ten days, Dr. Hoffman documented his productivity rating as 63%.

---

[7] Plaintiff does not argue that his disability impacted his ability to see a certain number of patients per day— for example, that he needed to take breaks throughout the day, which might have impacted his ability to meet the ten-patient-per day expectation—or that he was denied an accommodation on that basis.

But Plaintiff was scheduled to work three days per week—Wednesdays, Thursdays, and Fridays—and there were thirteen such days in the month of June 2012.[8]  If Dr. Hoffman's productivity evaluation indeed considered Plaintiff's absences, the number of working days listed would presumably have been thirteen, not ten, and accordingly the budgeted number of patients would have been 130, rather than 100—yielding a productivity rating of approximately 48%, rather than 63%.  Thus, even when viewing Dr. Hoffman's evaluation in a light most favorable to Plaintiff, that evaluation does not suggest that Plaintiff's disability-related absences impacted his measured productivity.

Plaintiff also points to Dr. Sharp's deposition testimony as evidence that absences lowered an individual's measured productivity.  *See* SUF ¶ 87.  Plaintiff mischaracterizes Dr. Sharp's deposition testimony, however—she stated that "[a]bsences from work for whatever reason would have [an] impact on productivity *with the caveat* that when we determine an annual budget for an individual clinician, what is taken into account are four weeks of vacation, one week of conference time, one personal day or two, and a week's worth of sick time."  Sharp Dep. at 133:3–10 (emphasis added), Dkt. No. 60-2.  As already noted, Plaintiff concedes that all of his absences were covered as paid sick leave.  Thus, Dr. Sharp's testimony does not provide support for the assertion that his disability-related absences affected his measured productivity.

In sum, Plaintiff fails to present sufficient evidence for a reasonable jury to conclude that his employer refused to provide an accommodation.  The Court notes that Plaintiff's complaint does not allege a discriminatory discharge claim under the ADA, which is a separate cause of action from

---

[8] The Court may take judicial notice of the June 2012 calendar, and the number of Wednesdays, Thursdays, and Fridays falling within that month.  *See* Fed. R. Evid. 201(b)(2); *see also Matye v. City of New York*, No. 12-cv-5534 (NGG) (VVP), 2015 WL 1476839, at *20 n.19 (E.D.N.Y. Mar. 31, 2015) ("The court takes judicial notice of the 2011 calendar."); *Jin v. Pac. Buffet House, Inc.*, No.06-cv-579 (VVP), 2009 WL 2601995, at *6 (E.D.N.Y. Aug. 24, 2009) ("Having consulted a calendar, the court takes judicial notice that February 8 is a Saturday.").

a failure-to-accommodate claim. *See Daniels v. Health Ins. Plan of Greater New York*, No. 02-cv-6054 (HB), 2007 WL 27115, at *10–11 (S.D.N.Y. Jan. 4, 2007) (analyzing causes of actions separately); *Piccolo v. Wal-Mart*, No. 11-cv-406S, 2012 WL 1965440, at *8–10 (W.D.N.Y. May 31, 2012) (same); *Sanchez v. United Cmty. & Family Servs., Inc.*, No. 14-cv-1810 (VLB), 2015 WL 5010619, at *1 (D. Conn. Aug. 24, 2015) ("Claims for reasonable accommodation and discrimination are distinct claims for relief . . . ."); *see also Green v. Nat'l Steel Corp., Midwest Div.*, 197 F.3d 894, 898 (7th Cir. 1999) ("a failure to accommodate claim is separate and distinct from a claim of discriminatory treatment under the ADA"). In contrast, Plaintiff's complaint *does* allege a discriminatory discharge claim based on his disability under the NYSHRL and NYCHRL. *See* Compl. ¶¶ 47, 55. Because the Court declines to exercise supplemental jurisdiction over Plaintiff's remaining state law claims, as the Court explains in further detail below, the Court does not address Defendants' motion for summary judgment with respect to any such discriminatory discharge claims under the NYSHRL and NYCHRL.[9]

For the foregoing reasons, Defendants' motion for summary judgment with respect to Plaintiff's failure-to-accommodate claim under the ADA is GRANTED.

### D. Retaliation

Defendants also move for summary judgment regarding Plaintiff's claims for retaliation under the ADA and NYSHRL. The ADA provides that "[n]o person shall discriminate against any individual because such individual has opposed any act or practice made unlawful by this chapter or because such individual made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this chapter." 42 U.S.C. § 12203(a). The burden-shifting framework established in *McDonnell Douglas* applies to retaliation claims under the ADA and

---

[9] To the extent that Plaintiff's opposition raises a discriminatory discharge claim under the ADA, the Court finds that Plaintiff may not raise a new claim for the first time in his opposition to the motion for summary judgment. *See Scott*, 641 F. Supp. 2d at 229, and the cases cited above.

NYSHRL. *See Treglia v. Town of Manlius*, 313 F.3d 713, 719 (2d Cir. 2002) ("Claims for retaliation [under the ADA] are analyzed under the same burden-shifting framework established for Title VII cases."); *Summa v. Hofstra Univ.*, 708 F.3d 115, 125 (2d Cir. 2013) ("The burden-shifting framework laid out in *McDonnell Douglas* . . . governs retaliation claims under both Title VII and the NYSHRL.").

"To establish a prima facie case of retaliation under the ADA, a plaintiff must establish that (1) the employee was engaged in an activity protected by the ADA, (2) the employer was aware of that activity, (3) an employment action adverse to the plaintiff occurred, and (4) there existed a causal connection between the protected activity and the adverse employment action." *Weissman v. Dawn Joy Fashions, Inc.*, 214 F.3d 224, 234 (2d Cir. 2000) (quoting *Sarno v. Douglas Elliman-Gibbons & Ives, Inc.*, 183 F.3d 155, 159 (2d Cir. 1999)).

"Once a plaintiff establishes a prima facie case of retaliation, the burden shifts to the defendant to articulate a legitimate, non-retaliatory reason for the challenged employment decision." *Treglia*, 313 F.3d at 721. "If a defendant meets this burden, the plaintiff must point to evidence that would be sufficient to permit a rational fact finder to conclude that the employer's explanation is merely a pretext for impermissible retaliation." *Id.* (internal quotation marks and citation omitted). "A plaintiff may prove that retaliation was a but-for cause of an adverse employment action by demonstrating weaknesses, implausibilities, inconsistencies, or contradictions in the employer's proffered legitimate, nonretaliatory reasons for its action. From such discrepancies, a reasonable juror could conclude that the explanations were a pretext for a prohibited reason." *Zann Kwan v. Andalex Grp. LLC*, 737 F.3d 834, 846 (2d Cir. 2013).[10]

---

[10] In *University of Texas Southwestern Medical Center v. Nassar*, 133 S.Ct. 2517 (2013), the Supreme Court found that a plaintiff asserting a Title VII retaliation claim must "show that retaliation was a 'but-for' cause of the adverse action, and not simply a 'substantial' or 'motivating' factor in the employer's decision." *Zann Kwan*, 737 F.3d at 845 (citing *Nassar*, 133 S.Ct. at 2526, 2533). Although both parties here agree that the "but-for" standard applies to Dr. Nassry's retaliation claims, *see* Pl.'s Opp'n at 6, "the question of whether the

"[I]nformal complaints to management may constitute protected activity" under the ADA. *Graham v. Macy's, Inc.*, No. 14-cv-3192 (PAE), 2016 WL 354897, at *8 (S.D.N.Y. Jan. 28, 2016) (citing *Treglia*, 313 F.3d at 721 n.5). Moreover, "[i]t is well established that requesting an accommodation, without filing a formal charge or engaging in other specific behaviors listed in § 12203(a), is nonetheless behavior protected from an employer's retaliation." *Munoz v. Manhattan Club Timeshare Ass'n, Inc.*, No. 11-cv-7037 (JPO), 2014 WL 4652481, at *1 (S.D.N.Y. Sept. 18, 2014) (internal quotation marks and citation omitted), *aff'd,* 607 F. App'x 85 (2d Cir. 2015); *see also Weixel v. Bd. of Educ. of City of New York*, 287 F.3d 138, 149 (2d Cir. 2002) (allegation that plaintiffs "seeking reasonable accommodation" of disability "constitutes protected activity under [the Rehabilitation Act]/ADA"). "To prevail on a retaliation claim, the plaintiff need not prove that her underlying complaint of discrimination had merit, but only that it was motivated by a good faith, reasonable belief that the underlying employment practice was unlawful[.]" *Zann Kwan*, 737 F.3d at 843 (internal quotation marks and citations omitted).

Plaintiff's argument in opposition to Defendants' motion for summary judgment regarding the retaliation claims suffers from similar infirmities as his argument opposing the failure-to-accommodate claims—namely, he raises new claims and theories that are arguably outside the scope of the retaliation claims pleaded in the complaint. The complaint alleges that "Plaintiff sought reasonable accommodations of his disabilities," and in retaliation for seeking such accommodations, he was terminated from his employment. Compl. ¶¶ 44–45, 50–51. Thus, the alleged protected activity in the complaint was limited to his requests for reasonable accommodation—which, as

---

heightened, 'but-for' standard of causation for Title VII retaliation claims . . . applies to claims asserted under the ADA, is one that has not yet been addressed by the Second Circuit." *Castro v. City of New York*, 24 F. Supp. 3d 250, 269 n.34 (E.D.N.Y. 2014). Several courts in other circuits have applied the but-for standard to ADA claims. *See Sherman v. Cty. of Suffolk*, 71 F. Supp. 3d 332, 349 (E.D.N.Y. 2014) (collecting cases). Because the Court concludes that Plaintiff fails to establish a genuine issue of material fact under either standard, the Court need not resolve the issue in this case.

discussed, was in turn limited to a veiled request for a negative air pressure room and a request to reschedule a meeting.  In his opposition, however, Plaintiff instead primarily argues that he was terminated for raising complaints to office managers and the Human Resources Office, following the July 5, 2012 meeting with Dr. Hoffman.  In any event, the Court need not determine whether Defendants had sufficient notice of the overhauled retaliation claim—Plaintiff failed to present sufficient evidence to survive the motion for summary judgment with respect to both those claims alleged in the complaint and those claims alleged in his opposition.

First, with respect to the retaliation alleged in the complaint, Plaintiff fails to present sufficient evidence that he engaged in protected activity, and thus the claims fail at the prima facie stage.  For the reasons already discussed, Plaintiff fails to provide any evidence that his ambiguous complaint regarding the office's cold air was a request for an accommodation.  Thus, his complaint to Ms. Leyba, standing alone, is insufficient to constitute protected activity.  *See Int'l Healthcare Exch., Inc. v. Glob. Healthcare Exch., LLC*, 470 F. Supp. 2d 345, 357 (S.D.N.Y. 2007) (finding that "[a]mbiguous complaints that do not make the employer aware of alleged discriminatory misconduct do not constitute protected activity" in Title VII context); *see also Goonewardena v. N. Shore Long Island Jewish Health Sys.*, No. 11-cv-2456 (MKB), 2013 WL 1211496, at *9–10 (E.D.N.Y. Mar. 25, 2013) (finding no protected activity and dismissing ADA retaliation claim where plaintiff's complaint to hospital administrators did "not contain any language that could reasonably be understood to be a complaint of discrimination on the basis of disability"), *aff'd*, 597 F. App'x 19 (2d Cir. 2015).

Moreover, and as already discussed above, Plaintiff's opposition fails to address his claim that any supervisor refused to reschedule a meeting with him.  Nor does Plaintiff's opposition or Local Rule 56.1 Statement identify any facts supporting the assertion that he ever complained about his employer's failure to reschedule a meeting, in order to constitute protected activity for purposes

of any retaliation claim.  Accordingly, Plaintiff fails to provide sufficient evidence to establish prima facie case of retaliation, based on the claims alleged in the complaint.

In opposition to Defendants' motion, Plaintiff argues for the first time that he was also terminated in retaliation for raising complaints to office managers and the Human Resources Office, following the July 5, 2012 meeting with Dr. Hoffman.  Even assuming that Plaintiff has established a prima facie case of retaliation on this basis, Plaintiff nevertheless cannot demonstrate that Defendants' reasons for terminating his employment—based on Plaintiff's errors in his patients' dental charts—was pretext for impermissible retaliation.

Plaintiff primarily attempts to demonstrate pretext by arguing that the errors in his patients' dental notes were not serious enough to warrant termination, and that, in any event, his charts contained similar copying and pasting errors throughout his brief employment.  *See* Pl.'s Opp'n at 21–22 ("the alleged new and damming [*sic*] deficiencies in the post-July 5 Meeting charts—copying and pasting—were not new at all but appeared in pre-July 5 Meeting charts").  But Plaintiff's argument ignores that Dr. Hoffman testified that he recommended termination not just because there were errors in the dental notes, but because Plaintiff's dental notes failed to show any improvement over time and were "actually getting worse."  Hoffman Dep. at 173:23–174:12.  More fundamentally, however, any dispute regarding whether the errors were egregious enough to warrant termination is insufficient to demonstrate pretext.  *See Trane v. Northrop Grumman Corp.*, 94 F. Supp. 3d 367, 381 (E.D.N.Y. 2015) ("Plaintiff's assertion that negative comments regarding his work are false is, once again, insufficient to show that Defendant's reasons are pretexts."); *see also McPherson v. New York City Dep't of Educ.*, 457 F.3d 211, 216 (2d Cir. 2006) ("In a discrimination case . . . we are decidedly not interested in the truth of the allegations against plaintiff.  We are interested in what '*motivated* the employer[.]'") (quoting *U.S. Postal Serv. Bd. of Governors v. Aikens*, 460 U.S. 711, 716 (1983)); *Anderson v. Nat'l Grid, PLC*, 93 F. Supp. 3d 120, 145 (E.D.N.Y. 2015) ("The question in any

discrimination case is not whether the defendant's decision to fire the plaintiff was correct, but whether it was discriminatory.).

Plaintiff also relies on the temporal proximity between his complaints and his ultimate termination. Although "[t]he temporal proximity of events may give rise to an inference of retaliation for the purposes of establishing a prima facie case of retaliation . . . without more, such temporal proximity is insufficient to satisfy [a plaintiff's] burden to bring forward some evidence of pretext." *El Sayed v. Hilton Hotels Corp.*, 627 F.3d 931, 933 (2d Cir. 2010). Standing alone, the temporal proximity between Plaintiff's complaints and his ultimate termination fails to demonstrate pretext for a retaliatory animus.

Plaintiff's other evidence consists of purported inconsistencies and contradictions in Dr. Hoffman's stated reasons for recommending termination, but he fails to raise a genuine dispute as to any *material* fact or sufficient evidence to permit reasonable jury to conclude that the proffered explanation for his termination was merely pretext for retaliation. For example, Plaintiff argues that Dr. Hoffman's evaluation was "clear that Dr. Nassry had six months to improve his charts." Pl.'s Opp'n 21. Although Plaintiff was placed on a probationary status that extended through December 2012, Dr. Hoffman's evaluation did not provide that he had six months to begin improving his performance. Rather, the evaluation stated only that "[b]ecause of the poor quality of [Dr. Nassry's] notes . . . I will continue evaluating his performance during the planned probation period with high reservation." Nassry Evaluation at D000971. Thus, there is no inconsistency in Dr. Hoffman's decision to recommend termination prior to the end of the probationary period, given his testimony that the errors in Plaintiff's dental notes became worse over time, and his plan to maintain "high reservation" during the probationary period, that permits the inference of pretext for impermissible retaliation.

For the foregoing reasons, Defendants' motion for summary judgment with respect to Plaintiff's retaliation claims under the ADA and NYSHRL is GRANTED.

### E.  State Law Claims

Under 28 U.S.C. § 1367(c)(3), the exercise of supplemental jurisdiction over Plaintiff's remaining claims under the NYSHRL and NYCHRL is within the Court's discretion if it has "dismissed all claims over which it has original jurisdiction." The Second Circuit counsels *against* exercising supplemental jurisdiction in such a situation: "[I]f the federal claims are dismissed before trial, even though not insubstantial in a jurisdictional sense, the state claims should be dismissed as well." *First Capital Asset Mgmt., Inc. v. Satinwood, Inc.,* 385 F.3d 159, 183 (2d Cir. 2004) (quoting *Castellano v. Bd. of Trustees,* 937 F.2d 752, 758 (2d Cir. 1991)).

Having dismissed all of Plaintiff's claims that were based on a federal question under 28 U.S.C. § 1331, and there being no other basis for federal jurisdiction over this case, the Court declines to exercise its supplemental jurisdiction over Plaintiff's remaining state law claims. *See* 28 U.S.C. § 1367(c)(3).  Accordingly, those claims are dismissed without prejudice.

## IV.  CONCLUSION

For the reasons outlined above, Defendants' motion for summary judgment is GRANTED. The Clerk of Court is directed to terminate all pending motions and to close this case.

SO ORDERED.

Dated: March 31, 2016
New York, New York

_____
GREGORY H. WOODS
United States District Judge